## Wytheville.

VIRGINIA FORD WILLIAMS, WHO SUES BY, ETC. v. AL. W. WILLIAMS.

June 13, 1929.

The opinion states the case.

*Smith & Gordon, Gordon B. Ambler*, and *Robert V. Hatcher*, for the appellant.

*Robert W. Strange* and *O'Flaherty & Pitt*, for the appellee.

PRENTIS, C. J., delivered the opinion of the court.

The appellant sued her husband under Code, sections 5104 and 5115, for divorce from bed and board, alleging his cruelty and her reasonable apprehension of bodily hurt, and prayed that if granted, after three years the decree should be merged into a decree for divorce from the bonds of matrimony.

The appellee answered, depositions were taken, and the court held that the appellant was not entitled to the relief prayed for, and dismissed the bill. This decree is before us for review.

The parties were married July 10, 1925. They have no issue, and this suit was brought after nineteen months of most unhappy married life for the wife. The marriage was a hasty one, occurring after an acquaintance of about two weeks.

The case presents no novel question of law, and we do not think it would be a kindness to the parties or serve any good purpose to recite all of the details which the record discloses. The defense rests almost entirely upon the testimony of the husband himself. The evidence of the other witnesses introduced by him is largely negative in character, while he makes a number of admissions which corroborate many of the allegations of the bill.

About two weeks after the marriage, she first learned

from him that he had changed his name without legal authority. He was of Austrian parentage, his true name being Aladar Wilhelm Varsvari, but when he secured his marriage license he stated that his name was Aladar W. Williams, and he also then falsified the names of his parents, saying that their names were Joseph W. and Anne Williams.

Among the incidents of cruelty proved by a preponderance of the testimony are these:

(a) At a card game at the home of her sister, Mrs. Dunlop, her husband became angry while playing cards, not however for any misplay on her part, and reached across the table and hit her in the face. This assault, testified to by her, is corroborated by the evidence of Mrs. Dunlop, who among other things says: "Well, the four of us were playing cards, and for no reason at the time he slapped Mrs. Williams;" that she perceived no reason for it; that he simply lost his temper over the cards. The defendant himself corroborates this occurrence in this language: "Mrs. Williams passed a remark to me with the idea of humiliating me before her family as she made it a point to do that, and this time I was fed up on it, and that time there were present Mrs. Dunlop and Mrs. Wm. Boyd, sisters of Mrs. Williams, Mr. John Dunlop and Mr. Wm. Boyd. We were playing cards and she aggravated me by what she said, and with that she got up and I got up, and I hit her across the back with my open hand."

(b) On another occasion, while they were visiting Mrs. Boyd, her sister in Philadelphia, and taking a meal at Bookbinder's Restaurant, her husband began drinking and became boisterous, and upon her protesting he became worse and the party had to break up. As she passed out of the restaurant door, he struck her on the head three or four times. When they got out

on the street he picked up a piece of ice and threw it at her, striking her in the back. His conduct was so boistrous and threatening that their friends, the Boyds, found it necessary to take them home separately. Mrs. Boyd corroborates this occurrence, in substance, and says: "Al hit her on the back and knocked her out of the door. There was ice on the street at the time, and he picked up a piece and threw it at her." The appellee's version of this is the admission that he shoved her out of the door—not a very hard shove.

(c) There was evidence that again, while in Philadelphia, a stranger walked up and wanted to sell him some whiskey, which she begged him not to buy, but he disregarded her request and became so furious with her that he struck her on the head. Her sister, Mrs. Boyd, testified that he hit her on the head three or four times very hard. The accused makes this inadequate defense in his testimony: "I don't know exactly what happened but we had an argument or fuss, due to something—this constant picking. Mr. Boyd's car broke down and we all got in this taxicab and drove up to the house and while sitting next to my wife she started worrying me again and I did strike her over the head with my open hand, not with my fist."

(d) On another occasion, while at the Jefferson Hotel, in Richmond, the appellant testified that her husband became very abusive and struck her several times; that she defended herself as best she could, had a porter called, and her husband struck her in the porter's presence. The porter corroborates this in this way: "They asked me to wait a while and I waited out in the hall, and then they asked me in. They were still fussing and he hit her."

"Q. How did he hit her? Did he hit her in an easy manner?"

"A. It looked like he wanted to hit her hard. He swung at her pretty hard. They tussled around and I told them to cut it out."

"Q. Then did this young lady ask you to stop him?"

"A. Yes, sir." According to the testimony of the porter, the husband must have been drinking or he would not have carried on as he did. As she was leaving the room he made a remark to her so vulgar that the porter declined to repeat it. The husband admits that on this occasion he had a gallon keg of whiskey in the room, which he says was given to him by his wife's family; that they had a fight and she kicked him in the mouth; and that he struck her with his open hand on the back.

(e) At a boarding house at Virginia Beach, when the husband came to the supper table drunk, upon her protesting to him he became angry and abusive. He had a two or three gallon container with a small quantity of whiskey in it in his room there.

(f) The occurrence which caused the final break may be summarized thus: She had frequently protested and threatened to leave him. October 2, 1926, they had an engagement to meet at a hotel in Charlottesville to attend the Virginia-Georgia football game together. She could not find him at the hotel specified, and then went with her friends to Lambeth Field, where they found Mr. Williams intoxicated, and, as she testified, very slovenly in his appearance. While sitting in the stadium during the game he entered into an argument with some one sitting near, was boisterous, and finally engaged in an altercation with another man which resulted in their going out of the stadium to fight it out. She thinks the fight would have occurred but for the intervention of friends and the threat of a policeman to lock him up if he continued his miscon-

duct. This humiliating occurrence is corroborated by two witnesses—her friend, Miss Christine Butler, and Dr. Richard W. Folkes, who did not know them. He said that Williams' conduct was loud and embarrassing to him; that he (Williams) was under the influence of liquor, and he (witness) heard a policeman tell Williams: "You are drunk. This other man is not drunk and is quiet. If you don't shut up I will lock you up." Respondent denies that he was unkept and unclean, and denies that he was guilty of any misconduct, but admits that when the other man accused him of not being a gentleman he retired to settle the argument.

The evidence is ample, exclusive of all the uncorroborated testimony of the appellant, the wife, to show that the husband, appellee, was in the habit of drinking to intoxication, of appearing in public in a drunken condition with his wife, of humiliating her in the presence of his friends in private homes as well as in public places, by profanity and improper conduct; that he struck her or slapped her in anger in public on several occasions; that on one occasion, in the presence of the porter at the hotel, he was guilty of unmentionable obscenity; and that he claimed on one occasion, when charged with serious misconduct, that as she was his wife he could and would do with her as he pleased. The qualified denials of the husband and his affirmative testimony are more in the nature of special pleading than evidence, and it is charitable to say that his frequent intoxication is perhaps the explanation of his reprehensible conduct.

All this being true, it is manifest, in our judgment, that the trial court erred in refusing to grant her a divorce *a mensa et thoro*. While the courts are, as they should be, reluctant to grant divorces simply because people have high tempers, quarrel with each

other for slight or sufficient reasons and prove incompatible, it is nevertheless true that when the evidence shows cruelty, the injured spouse is entitled to the divorce authorized by the statute. We think that the case proved clearly justified the granting of the relief prayed for. While husband and wife should bear with each other and sympathize with the common human frailties, no wife, or husband either, is called upon to endure insults, violence and humiliation such as this husband has inflicted upon this wife. Precedents are abundant to support the conclusions which we have stated, but the facts are so convincing that citations are unnecessary.

■ It is claimed that the appellant condoned the latest offense at Charlottesville when the husband returned to Richmond a few days later. It is only necessary to say as to this that the burden of proof was upon the husband, and so far from proving it, his own admissions as to her reception of him at and during that time and their strained relations when he sought reconciliation, demonstrate the fact that there was no condonation.

We shall, therefore, enter a decree here granting the wife a divorce *a mensa et thoro* from her husband, upon the ground of cruelty and reasonable apprehension of bodily hurt, and remand the case to the trial court with directions to make such other legal orders as may hereafter be necessary or appropriate.

*Reversed.*