# Richmond

## WILLIAM F. HUDGINS v. MADELINE MISTER HUDGINS.

January 18, 1943.

Record No. 2604.

Present, Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*Richard B. Kellam* and *W. R. Ashburn*, for the appellant.

*Tom E. Gilman* and *James G. Martin & Son*, for the appellee.

BROWNING, J., delivered the opinion of the court.

The parties here were married on December 29, 1930. Each of them had been married before and each had been divorced. Both were representatives of prominent families of their respective counties. He is a citizen of Princess Anne county, Virginia, who had been a member of the board of supervisors and who was at the time of the institution of the suit the clerk of the circuit court. She was a resident of Northampton county, Virginia, which is a part of what is known as the Eastern Shore. It is across Chesapeake Bay. Her introduction to Princess Anne county was as a teacher in its public schools. While she was teaching at Kempsville, he courted and married her. She changed her residence to his home but continued to teach and a number of her co-teachers roomed and boarded at their home.

They were young in years, but had had rather wide experience in life. They, their roomers, and their friends, were fond of society and loved what is generally accounted a good time. They lived near Virginia Beach and enjoyed its social activities. Their particular neighborhood seemed to afford many such pleasures. They had boating parties, club socials, dinners and whatnot, which brought together the socialites. At all of these functions liquor, in some form, was served and freely consumed.

Not long after their marriage, she, while still teaching at Kempsville, went to the University of Virginia for a summer course. On one occasion her husband, with two of his friends, went to visit her without letting her know in advance of their coming. When they arrived at her lodging place he found her very much under the influence of liquor. When she had recovered sufficiently to discuss with him the matter she said that this was her first venture and that it would never be repeated. Her condition was known to his friends as well. This happened in 1932, and there was no like recurrence until the summer of 1934, when she became intoxicated at a dinner, in their own home when some of her husband's political friends were being entertained. Thereafter it was of constant occurrence. At a beach party, in the summer of 1935, she became intoxicated and so nauseated that she had to be taken home and put to bed. In 1936, when there was a wedding in the Hudgins family, she drank to the extent of intoxication at three parties, including the wedding. In 1937, at a dinner in their own home, given to persons who were not their most intimate friends, she was visibly under the influence of liquor, though nothing of the sort was served at that time.

On various occasions in the subsequent years of 1938, 1939, 1940 and 1941, there were frequent repetitions of these conditions. Once, upon becoming intoxicated at a place of amusement at Virginia Beach, at the remonstrations of her husband after he had gotten her home, she bit him. At another time, on a boating party, when she was intoxicated, she roundly abused the school authorities, because she was not reappointed as a teacher, using a common but very obnoxious form of profanity. The authorities had adopted the policy of not engaging married women as teachers. At still another time, when she was spending Christmas on the Eastern Shore, her husband visited her without announcing his coming, and upon his arrival she was out at a party and did not return until three o'clock in the morning. She was then under the influence of liquor,

which so disgruntled him that he went to Cape Charles, some distance away, to spend the night at a hotel, but at the instance of the members of her family he returned to her home.

These things happened again and again. They were so frequent as to have become quite habitual. On one occasion, at an entertainment, she had to be assisted to an upstairs bathroom, where she fell into the bathtub. This course of conduct was a source of great embarrassment to her husband, who felt that his material wellbeing and his official career were greatly imperiled by it, to say nothing of his peace of mind and domestic happiness. His protests were without effect. He besought her to desist. But as recently as February, 1941, when they were attending the President's ball at the Cavalier Hotel, at Virginia Beach, she had to be taken to the ladies' rest room and then to their car to be taken home.

There is evidence to the effect that she would purchase liquor at the ABC stores when she would be in Norfolk, sometimes in person and sometimes through an employee of one of the stores with which she dealt, and through a filling station attendant, and through a laborer on her husband's farm, taking care to conceal all this from her husband.

The various phases of these things were testified to by the teachers who lived with them and by the treasurer of the county and other citizens, and persons who were present and witnessed what they testified about. In fact such an array of unimpeached testimony is presented as to very nearly impel conviction. It is true that some of the incidents are denied by Mrs. Hudgins, but she admitted a sufficient number of them to negative the testimony of other witnesses introduced by her, who testified that they never saw her take a drink or heard of her having taken one. She confesses, and avoids to the point of justification, with the statement that everyone else drank, the inference being that it was quite the thing to do. Indeed, the evidence does cause the reflection that much more of it was consumed than was good for anyone. One is shocked at the presence

of marital lives happily and auspiciously begun, but wrecked on the rocks of an insatiate appetite for liquor.

We do not think that the evidence warrants the thought that there is involved in the conduct of Mrs. Hudgins any notion of turpitude beyond that which is embraced in the formation of a deplorable habit. She was the victim of a propensity which always bodes disaster of some sort.

Naturally their relations became more and more strained. He forbade and admonished. She resented and looked for dents in his armor. She would repair to her room and stay alone. In the spring of 1941, she answered a midnight telephone call for him. His responses to the person who was calling aroused her suspicions, she said, and his explanation did not allay them, she also said. Smarting under this she went into his trousers pocket and found his bill fold and in it was a package of contraceptive devices, which she concluded was positive evidence of moral dereliction and marital infidelity. She accused him of improper relations with a woman whom she named and she undertook then to ferret this out by going at night to where she thought he would be and was in the alleged fulfillment of an assignation. She testified to some circumstances of a suspicious nature from which she drew conclusions. The woman in question was not called as a witness and no further attention appears to have been paid to the charge or to her. At most it was vague and led nowhere. She employed a detective to watch her husband and unearth anything awry that he could find. The detective was not called as a witness and the record does not contain any news of him one way or another. The charge was not proven. We may say that the suspicious package which Mrs. Hudgins said that she found was unbroken and she only identified the contents by opening it with a pair of scissors. Mr. Hudgins denied any knowledge of the things and denied that he had ever been untrue to his wife.

He instituted this suit charging her with cruelty which was tantamount to desertion and prayed for a divorce from bed and board on that ground. She filed an answer which

she asked to be treated as a cross bill. She denied the allegations of his bill and made charges which are unnecessary to detail except that she charged him with deserting and abandoning her on July 14, 1941. It appears that on that day he left their home and went to live at the home of his father and did not return to her. This was after suit had been brought.

The trial court dismissed the original and amended bill filed by Mr. Hudgins and granted Mrs. Hudgins a divorce *a mensa et thoro* on her cross bill and allowed her $160.00 per month as alimony and her counsel the sum of $1000.00 for their services. The case is before us upon the appeal allowed Mr. Hudgins.

We are mindful of the force and effect of a decree of a chancellor who has heard the evidence *ore tenus*, as was the case here.

The trial judge seemed to have based his decision largely upon what we said in the case of *Holt* v. *Holt*, 174 Va. 120, 127, 5 S. E. (2d) 504. There we made a *resume* of the effect of the facts brought out and we undertook to distinguish between an erstwhile acceptation of the value of those facts and their present assessment in life. We adhere to that but observe that it was pertinent in a case which was wholly different from this one in its setting and in its controlling incidents and facts. We have no similar picture here.

After a careful examination of the nearly 400 pages of this record we can arrive at no other conclusion than that the learned chancellor misconceived the evidence and the law and that the decree entered is erroneous in its dismissal of the plaintiff's bill and its failure to grant him a qualified divorce, and in awarding to the defendant a divorce.

Mrs. Hudgins, the appellee, moved this court to dismiss the petition for appeal because it offended certain of its rules requiring the petition to state the facts of the case with references to the appropriate pages of the record. We think the facts were stated with reasonable precision and clarity. It is said that so much matter that is germane has

been omitted that unless this court toiled through the vast evidence it would be totally misled. This court has to do that anyway.

We do not think that the position of the appellee is sound to the effect that the plaintiff's failure to file his amended bill within the time granted him by the court rendered the court's decision on the defendant's demurrer *res adjudicata*. This question is controlled largely by the discretion of the trial court, particularly in a case in chancery. The circumstances of the existence of the amended bill in the clerk's office bearing the notation "Filed 9/8/41", satisfied the chancellor on this point and we cannot say that his ruling was error.

We think that the fee allowed to Mrs. Hudgins' attorneys was reasonable. The actual trial of the case in court consumed four days. The preparation of a case containing matter making a record as voluminous as this required a prodigious amount of work.

That the conduct of the wife as to her habits and as to the unproven and unestablished charge of adultery on the part of her husband constitutes cruelty which will justify a decree of divorce *a mensa et thoro* is established by the decisions in the following cases: *Williams* v. *Williams*, 152 Va. 896, 148 S. E. 579; *Twohy* v. *Twohy*, 130 Va. 557, 107 S. E. 642; *Ringgold* v. *Ringgold*, 128 Va. 485, 104 S. E. 836, 12 A. L. R. 1383; *Owens* v. *Owens*, 96 Va. 191, 31 S. E. 72; *Chandler* v. *Chandler*, 132 Va. 418, 112 S. E. 856; *Elder* v. *Elder*, 139 Va. 19, 123 S. E. 369; *Boos* v. *Boos*, 93 W. Va. 727, 117 S. E. 616.

It seems well settled that the absenting of one spouse from the other after the institution and during the pendency of a suit for a divorce, as here, is not desertion in law and it is not an act upon which a suit for desertion may be predicated. Indeed, in many cases it is highly proper that such physical separation should be, and under many circumstances it is commendable.

See the following: *Renner* v. *Renner*, 177 Md. 689, 12 A. (2d) 195, 127 A. L. R. 674; *Criser* v. *Criser*, 109 W. Va. 696, 156 S. E. 84; *Craig* v. *Craig*, 118 Va. 284, 87 S. E. 727.

The decree complained of is reversed except as to the amount of the fee, fixed for the attorneys, which this court thinks is not excessive, but is ample, in which respect it is affirmed, and this court will enter a decree granting to the appellant a divorce *a mensa et thoro* from the appellee and requiring the appellant to pay to the attorneys of the appellee $1000.00 attorneys' fee and the court costs.

*Reversed in part and affirmed in part.*